Good morning, counsel. Welcome. Good morning, Your Honor. May it please the Court, my name is David Sussinger. I represent the appellant Jesus Martinez Delgado. With the Court's indulgence, I'd like to first start by discussing the evidentiary hearing issue and then move on, time permitting, to the reconcilable conflict issue and any other issues that I might have time to discuss. Okay. Do you want to reserve any time? I probably would like to reserve some time, Your Honor, approximately two to three minutes. How many? Approximately two to three minutes, Your Honor. Okay. Very good. Thank you. And, of course, I'd be glad to answer any questions the Court might have on any topics at any time. Okay. Just by way of brief introduction, by the time Mr. Martinez Delgado was brought into federal custody in 2009, he had not served any state custodial sentence of greater than five years. He was nothing more than an ounce-level, mid-level distributor, as even the government acknowledged in its closing argument at trial, had never been affiliated with any gang. His sole contact with the main gang that was the crux of the federal indictment in this case, the Barrio Hawaiian Gardens gang, was merely selling ounce-levels of crack cocaine to a couple of people who were either members or associates of that gang. He didn't have any history of violence, didn't have any history of firearms or any other kinds of weapons type conduct. So, and we acknowledge the government has the prerogative by combination of Section 841 and Section 851 to have charged the two felony drug priors that Mr. Martinez Delgado had. We don't think it was just under the circumstances of this case. And, of course, the government has a continuing obligation to always assess whether the conviction and the sentence are appropriate under the circumstances. Now, with that in mind, at the time that Mr. Martinez Delgado was interrogated by Deputies Alexander Gomez and Deputy Jeff Boscott of the L.A. County Sheriff's Department on September 17th of 2009, Mr. Martinez Delgado, as he alleged, along with his motion to suppress in federal district court, that he did not completely understand what agent, what Detective Gomez had asked him, because he said in his own words that Detective Gomez's Spanish was, quote, not very good. Is Detective Gomez the same detective who conducted the interrogation that followed the warnings? He is the same detective who conducted the interrogation following the warnings. And has your client ever claimed to have had any trouble communicating with him throughout that interrogation? He claimed that he did not understand the Miranda warnings at the outset, Your Honor. We acknowledge that he did not claim to have later had problems communicating with Detective Gomez. Now, because Detective Gomez acknowledged, both in his declaration and during his testimony at trial, that he was reading from a preprinted form, it's entirely possible, and this could be developed during an evidentiary hearing, that the agent's reading of Spanish, now, he says he's a native speaker, but people, of course, have different dictions when they read. With respect, you've put a lot of things up on the wall here. I'm really surprised you've started with this one, because here you've got a man who is a native Spanish speaker. He was reading from a preprinted form. As he went along, he asked your client, do you understand? Your client said yes, according to him. Your client signed the form in Spanish. It's an official form. He signed it. He didn't raise or didn't request an evidentiary hearing before the court on this issue. Is this your strongest point? We believe it is, Your Honor. Let me quickly correct something that I think you may have misstated. The form that he signed, I believe, was from interrogation in 2001, when he was arrested in connection with an earlier incident. I don't believe that the government submitted the actual form. I'm just looking at ER-403, said that Delgado claimed that he read a preprinted, officially approved translation card. According to ER-405, after the end of each Miranda write, the card directed Officer Gomez to ask if Delgado understood. He said he did ask that. I don't know what you're talking about with the earlier one, but at least this one, according to the record, it appears that Detective Gomez, Officer Gomez testified that he did have the official card, that he did read it, that he did ask whether your client understood, and he said he did. We acknowledge that he did attest to having read the declaration. The actual form that Mr. Delgado may or may not have signed in connection with the 2009 interrogation is not in the record. Did your client at any point state specifically what it is that – basically, is there any evidence other than his just general statement that he didn't understand very well? Did he put anything else on besides that in terms of his lack of understanding? We acknowledge, Your Honor, that the record is not further developed beyond his actual declaration, and if this case were to go to an evidentiary hearing on remand, Mr. Delgado, of course, would have to testify, and certainly at this point he has nothing to lose. So even though I haven't conferred with him regarding that, I have no reason to doubt that he wouldn't testify. Well, and you say that he actually, in 2001, had the Miranda rights read. It sounds like he may have this memorized like a book. You know, he knows what this is. I know the government has made that claim, Your Honor, but of course that would be subject to examining him regarding that particular issue. We also know – and this is appearing throughout the record – Mr. Delgado is a longtime substance abuser, so at an evidentiary hearing there would be questions regarding whether his substance abuse had in some way impaired his cognitive abilities. So even though he had been arrested previously, Your Honor, there are still questions as to whether on this date, given how Mr. Detective Gomez was reading the rights to him from a pre-printed form, and questions regarding how Detective Gomez's diction was when he was reading from the card. That should be subject to examination and cross-examination. Counsel, am I right that trial counsel did not even request an evidentiary hearing on this issue? Your Honor is correct that he did not specifically request one. We know he didn't decline one, but he didn't specifically. Well, but how could it have been, you know, obvious error for the district court to rule on the motion on the papers, given that it doesn't seem like a particularly complicated factual dispute that's in play, if your client's lawyer at the time didn't even suggest to the court that, you know what, I really think we need an evidentiary hearing to flesh these issues out, as you're arguing, you know, that should have been done now? Well, look, I think Your Honor is correct to suggest, Your Honor, that that may very well have been an error by Mr. McCurry, Mr. Martinez Delgado's trial counsel, to not specifically request one. And if the standard of review, you know, if it ends up being a plain error standard of review, and that is case determinative or at least issue determinative, that would be a very compelling 2255 issue for Mr. Martinez Delgado to assert at a later point. Now, having said that, this Court for decades, you know, and particularly has made clear in the United States v. Howell in 2000, that if there is a material issue of fact regarding allegations by a defendant that, if proven true, would lead to a motion being granted, then an evidentiary hearing must occur. So I believe that But the district court has discretion to determine the bona fides of that claim, right? You can't just make a generalized claim and expect that there's a, because there's a contrary view that you're entitled to a hearing, are you? Well, we acknowledge, Your Honor, that you can't have a general conclusory claim. But here there were sufficient specifics. What specifics did he allege? He alleged that Detective Gomez's Spanish was not very good. That's very general. I mean, you're talking about an, everybody knows this is an official card. I speak Spanish. Maybe not as well as your client does. But the reality is there are lots of dialects. There's lots of all kinds of things. But the reality is if you're reading from schoolbook Spanish, it's really straightforward there. You don't have to worry about dialect. You don't have to worry about slang. You don't have to worry about any of that. You're just reading a form. I'm just having difficulty seeing where your client has put flesh into his claim. If he said, I don't understand what something means, you know, a particular word or something, then maybe if that's an important word. But he just said, well, I didn't really understand him. His Spanish wasn't very good. And yet Detective Gomez was, Spanish is his primary language. He really can't accuse him of being illiterate in Spanish, or at least an inability to speak it, can he? We're not suggesting that Detective Gomez in any way was being untruthful regarding his Spanish-speaking abilities, Your Honor, but we do think that if this were subject to an evidentiary hearing, that a jurist would be able to determine, you know, other than Detective Gomez's self-assessment. How would he prove it? What would he allege? What's your proffer, in other words? The proffer would be that he didn't understand that he had the right to, that based on the rights read to him in Spanish, that he had the right to remain silent and the right to a counsel to be appointed to that. Have you ever read that card? Have I read that card? Have you ever read that card? It says, you have a right to remain silent. You don't have to speak. You have a right to a lawyer. What could be unclear about that? If it were clearly stated, Your Honor, we acknowledge that it is a sufficient recitation of Miranda rights. The question is whether my client at that time subjectively, cognitively understood that to be his right. He realized that every non-English-speaking defendant in the world could make that claim if he or she wished to do so. And what do we have then? I mean, the point is there has to be something to show specifically what it is that wasn't understood. You can't just say, well, I didn't really understand it very much. That doesn't work. Because it's such a short statement, Your Honor, and I agree there could have been even more detail, but I think there was sufficient detail to infer that he simply didn't understand that he had the right to remain silent and the right to appoint a counsel. Is there anything in the record to suggest that he was too intoxicated to understand that? You suggested that here at argument, but I hadn't seen that. I don't think I saw that in my preparation for today. I acknowledge, Your Honor, that there was nothing specific regarding that interrogation session to indicate that he was intoxicated or that he was under the influence. And he could have put that in his declaration where he said he didn't understand the Spanish if that were the case, right? He certainly could have, Your Honor. We just acknowledge that as a background fact that could be further developed that an evidentiary hearing at this Court would have remanded for that purpose. If there are no further questions, well, I think this is my time. You want to save some? I said that my time. Whatever you want to do. You've got just a little under three minutes left. I said that my time is rapidly diminishing, so I would like to reserve the remainder of my time.  Very good. Why don't you save that for rebuttaling, counsel? Thank you very much, Your Honor. We will now hear from the government. Good morning, Your Honors. May it please the Court. Rosalyn Wang on behalf of the United States. First, as to the evidentiary hearing issue, as Judge Smith pointed out, there was no dispute as to two important issues, the first being that the defendant was read his Miranda rights in Spanish, his native language, and second, that he agreed to talk to the government after being read his Miranda rights in Spanish. He also signed a Miranda form, did he not? No, he didn't, Your Honor. That form was from 2001, a prior instance which the government put in to show that he was familiar with these rights. And then the next point, as Judge Friedland mentioned, is that there then preceded an entire interrogation that was conducted in Spanish by Deputy Gomez. The rights are recorded in an audio recording. The interview itself was introduced into trial, and it's in the excerpts of record at pages 1813 to 1864. And in this, Deputy Gomez interviews the defendant in Spanish for about 50 pages. And within those 50 pages, there's not a single instance in which the defendant says, wait, stop, I don't understand your Spanish or I don't understand what you're saying. Where is the audio recording? It was part of the evidence at trial, but only the transcript is in the excerpts of record, Your Honor. So, and additionally, you know, it's a preprinted form. The preprinted form was attached to the government's opposition. As Judge Smith said, it's a very simple form. If you read it, it says you have the right to remain silent. Do you understand? There really isn't any room for interpretation in that kind of language. And also, as I said, that back and forth in terms of him being read his rights and him agreeing to waive is also recorded in the interview, in the excerpts. Thank you. The government doesn't believe that there's a true evidentiary issue in this. In any event, the district judge, we review what the district judge did for abuse of discretion, do we not? Exactly. Abuse of discretion, or even in this case, plain error, because the defendant didn't submit a reply brief to the government's opposition, never requested an evidentiary hearing, and frankly, never put forth any allegations that would contradict the fact that Deputy Gomez was a native Spanish speaker. So I guess unless there are any questions, I can move on to the other primary issue, which was the motion for substitution of counsel. I'd actually like to ask you about the wiretap. So he's made a bunch of arguments about the wiretap, and you did not argue that he lacked standing. I'm wondering why. He didn't lack standing because he was actually intercepted on that target telephone. So even though it was Rios' telephone and the wiretap was for tapping Rios' telephone, you don't view him as a third party to this? No, because he was intercepted as part of that particular wiretap order. So we believe that was authorized. In terms of the necessity, under the court's case in, I don't know how to say this, Ippolito? Ippolito. Ippolito. Ippolito, thank you. What the defendant has to show is, to show that there was no necessity, was that the government failed to follow methods that would have been potentially productive. And there's nothing that the defendant has identified here that would have been a potentially productive method that the government didn't consider. One of the main things was the search warrants. He said, well, why didn't you simply search Jorge Rios' residence, when in fact, in the affidavit, the government described having executed 15 different search warrants in this particular investigation. And while there were seizures as a result of that, those seizures didn't lead to the identification of drug suppliers and potentially caused, well, actually, and actually caused targets to destroy evidence in that case. So that was a specific, investigation-specific fact that the government pointed out. And also, the government also noted that there was surveillance attempted at Rios' residence, and there was a belated counter-surveillance by unknown males at the residence, where they identified the surveillance vehicle, they pointed it out, and then they started yelling towards Rios' residence. So for that reason, the surveillance itself wasn't going to work. And the government then did go through a bunch of the other traditional investigative techniques to identify why those techniques would not work with respect to this particular investigation. Counsel, can I ask you, you certainly don't have to, but would you care to respond to the comments that your opponent made at the outset of his argument about the government's decision to file the 851 information in this case? I just out of curiosity, I have to say that I kind of agree with him. I look at this, and I just don't understand. Why did the government think a life sentence for this guy was warranted? It just seems completely excessive. But I imagine there must have been reasons you guys had on your side. And again, you don't have to comment on it, but if you would care to, I would be very interested in hearing your response. Your Honor, this was a case, it was a very significant case. This defendant was a primary drug supplier to a very violent street gang that was the Hawaiian Gardens Gang that was terrorizing the city of Hawaiian Gardens, that was involved in the shooting and the murder of an L.A. Sheriff's deputy. Without the income from the sale of drugs, without the income from the taxation of drug suppliers, the gang would not have had its primary financial support. So the government did consider this an important target and an important issue. So the government is trying to make an example out of him, in other words. I mean, I don't – I wouldn't say example, Your Honor. I think that the defendant actually played an important role in supplying the gang with drugs, which was their livelihood. So if the Court doesn't have any other questions. Any other questions by my colleagues? I think no. Thank you very much. Appreciate it. Thank you so much. Counsel, we have a little rebuttal time. Thank you, Your Honor. Let me just quickly address a couple of points in regard to Judge Watford's observation regarding the government's decision to charge the two 851 priors. I'll note in, I believe, a still extant memorandum that then-Attorney General Holder issued on August 12, 2013, regarding Section 851, he enumerated several factors that the government should consider. First, whether the defendant was an organizer, leader, manager, or supervisors of others within a criminal organization, there was no evidence in this case to indicate that Mr. Martinez-Delgado in any way had that role. Did you bring that challenge? Mr. Martinez-Delgado did not, and his counsel did not in any way raise these as part of record-based challenges. Of course, it may be an issue that depending on the facts in this case and depending on whether the government in its plea negotiations tried to use Section 851 as a stick to try to encourage Mr. Martinez to plead guilty, there might be some sort of claim based on that, but we acknowledge that in the current record there isn't anything to suggest that. Is there anything in any part of the record where this has been challenged by the defendant? Not specifically, Your Honor, and we have to acknowledge that at this point. We do know that notwithstanding what Ms. Wang said about Mr. Martinez-Delgado's role in supplying narcotics to the organization, we know that at trial, at most, the proof suggested that Mr. Martinez-Delgado had, I think, under the most ambitious reading of the government's proof, had only supplied approximately 20 ounces of crack cocaine to Rios and Moises Benitez, the unidentified male on the intercepts. So we're not exactly talking about significant quantities of narcotics. Counsel for the government suggested there were other gang-related activities, and I think, if I understood it correctly, perhaps even a killing, but I perhaps misunderstood, that he was associated with at least in the eyes of the government. We know, Your Honor, that the government could have, in the indictment, chosen to charge Mr. Martinez-Delgado in the Rico conspiracy and the substance of Rico counts. It did not. He was only charged with conspiracy to distribute narcotics and with possession with intent to distribute narcotics. He is a mid-level distributor without any substantial gang ties. So, of course, this is certainly within the government's prerogative, but we would certainly encourage Ms. Wang and her colleagues as part of her ongoing duty to administer justice and determine what is just in a particular case to decide whether the taxpayer's resources should be expended on incarcerating Mr. Martinez-Delgado, who is not even a U.S. citizen and could be removed to Mexico for life in a federal penitentiary. If there aren't any further questions. Any questions by my colleagues? I think not. Thank you both for your argument. We appreciate it. The case just argued is submitted.
judges: M. Smith, Watford, Friedland